**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MACOMB COUNTY EMPLOYEES' RETIREMENT SYSTEM AND MACOMB COUNTY RETIREMENT HEALTH CARE FUND, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| v. | Complaint -- Class Action |
| FMC CORPORATION, MARK A. DOUGLAS, ANDREW D. SANDIFER, AND PIERRE R. BRONDEAU, | |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

Plaintiffs Macomb County Employees' Retirement System and Macomb County Retirement Health Care Fund (the "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of FMC Corporation ("FMC" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired FMC common stock between November 16, 2023 and February 4, 2025, inclusive (the "Class Period"). Plaintiffs bring this action seeking to recover damages caused by Defendants' (defined herein) violations of the federal securities laws under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. FMC is an agricultural sciences company based in Philadelphia, Pennsylvania. The Company manufactures insecticides and other crop protection products. FMC sells these products to wholesale distributors located in North America, Latin America, Europe, and Asia. The Company's distributors sell FMC products out of their inventories to retailers who ultimately sell the products to farmers.

3. During the height of the COVID-19 pandemic, supply chain disruptions and the fear of product shortages caused distributors to stockpile crop protection products in their inventories. As a result, FMC and other agricultural chemical manufacturers posted record

revenues that peaked in 2022. Shortly thereafter, supply chain disruptions eased as pandemic restrictions were lifted, which left distributors holding extremely high inventories. This excess channel inventory resulted in a revenue slowdown for FMC and its peers as distributors began to destock their inventories by significantly reducing their orders for crop protection products. FMC's revenues were also negatively impacted by mounting generic competition for its top-selling crop protection products. These headwinds came to a head for FMC on October 23, 2023, when the Company reported a staggering 29 percent year-over-year decrease in third quarter 2023 revenues due to "channel destocking in all regions."

4.      In the wake of these disastrous results, FMC unveiled a strategic restructuring plan called "Project Focus" to maximize operational efficiencies, right-size its cost base, and "normalize" distributor inventory levels. The Class Period starts on November 16, 2023, the day that the Company unveiled Project Focus during the "FMC Investor Day 2023." Throughout the Class Period, Defendants touted "excellent progress" of Project Focus and represented to investors that FMC was "reducing channel inventory every quarter" and that its channel inventories were "rebalancing" and "normalizing" at a faster pace than expected. The Company also told investors that Project Focus would result in massive cost savings that would contribute to the Company's future profits.

5.      Unbeknownst to investors, however, Project Focus failed to meaningfully improve distributor inventory levels and FMC had begun implementing "cost-plus" pricing arrangements with key distributors. Through these undisclosed pricing arrangements, FMC essentially gave away its expected profits from Project Focus cost savings to its distributors in the form of lower prices.

6.    Throughout the Class Period, Defendants misled FMC investors by failing to disclose that: (a) Project Focus was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (b) FMC's channel inventories were not rebalancing or normalizing, and in fact were getting worse; (c) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (d) FMC's cost-plus pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (e) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (f) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

7.    The truth about this fraud was revealed to the market on February 4, 2025, when FMC reported fourth quarter 2024 revenue that missed consensus revenue estimates by $90 million while disclosing that "growth was below [the Company's] expectations as [it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically."  The Company also issued disappointing 2025 financial outlook due to "weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory."

8.    Wall Street analysts were caught off guard by this news.  For example, analysts at Wells Fargo described FMC's 2025 outlook as a "shock to the system" driven by "company-specific inventory and cost actions impacting its price."  Analysts at Morgan Stanley expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries."  Analysts at Bank of America further stated that "the discussion of 'cost-plus' pricing is new, and in our

view may be a newer pricing approach that passes some of the already-expected 2025 [cost of goods sold] tailwinds to FMC's diamide partners thus hitting margins."

9.      On this news, FMC's stock price dropped $18.12 per share, or 33.5 percent, to close at $35.92 per share on February 5, 2025.  FMC lost over $2 billion in market capitalization in a single day.

10.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock pursuant to the revelation of the fraud, Plaintiffs and other members of the Class (defined herein) have suffered significant damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  The Company's principal offices are located in this District.  Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Defendants' wrongful acts also arose in, emanated from, and caused harm in this District.  Such acts include the dissemination of false and misleading statements into this District.  Additionally, venue is proper in light of the purchase of the Company's stock by members of the Class who reside in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the

United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

**PARTIES**

**A.    Plaintiffs**

15.    Plaintiffs Macomb County Employees' Retirement System and Macomb County Retirement Health Care Fund purchased or otherwise acquired FMC common stock during the Class Period.

**B.    Defendants**

16.    Defendant FMC is incorporated in Delaware and headquartered in Philadelphia, Pennsylvania.  FMC stock trades on the New York Stock Exchange under the ticker symbol "FMC."

17.    Defendant Mark A. Douglas ("Defendant Douglas") served as FMC's President and Chief Executive Officer from June 1, 2020 until June 11, 2024.

18.    Defendant Andrew D. Sandifer ("Defendant Sandifer") was at all relevant times FMC's Executive Vice President and Chief Financial Officer.

19.    Defendant Pierre R. Brondeau ("Defendant Brondeau") was at all relevant times Chairman of the Board of FMC and was appointed Chief Executive Officer of FMC on June 11, 2024.

20.    Defendant Douglas, Defendant Sandifer, and Defendant Brondeau are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FMC's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to,

5

or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Company Background

21.     FMC is a Delaware corporation that is headquartered in Philadelphia, Pennsylvania. FMC develops and commercializes crop protection products that include insecticides, herbicides, fungicides, and seed treatments. Among FMC's largest revenue generators are its patented diamide insecticides called Rynaxypyr and Cyazypyr. During the Class Period, Rynaxypyr and Cyazypyr accounted for approximately 40 percent of the Company's total revenues.

22.     While farmers are the main consumers of FMC's products, FMC primarily sells its products directly to authorized distributors. These distributors, in turn, sell FMC products to retailers, who then sell the products to farmers and other end-users. The Company has close and long-standing relationships with its distributors. In fact, FMC has worked with certain distributors for more than a quarter century. FMC has long-term agreements with these distributors to continuously supply them with inventory. Through these relationships, FMC has strong visibility into its distributors' inventory levels.

23.     Supply chain disruptions and the fear of product shortages during the COVID-19 pandemic caused distributors to overstock crop protection products in their inventories. By 2022, revenues at FMC and its peers jumped to record highs from this heavy buying activity. Thereafter,

distributors were left with excess crop protection products and began to significantly reduce their orders, resulting in a revenue slowdown for FMC. At the same time, mounting generic competition for Rynaxypyr and Cyazypyr were negatively impacting FMC's revenues. These challenges culminated on October 23, 2023, when FMC reported a 29 percent year-over-year decline in revenue for its third quarter of 2023 because of "channel destocking in all regions."

24.     Shortly thereafter, FMC unveiled a strategic restructuring plan called "Project Focus" to maximize operational efficiencies, right-size its cost base, and "normalize" distributor inventory levels. Among other things, FMC told investors that Project Focus would result in massive cost savings that would contribute to the Company's future profits.

**Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on November 16, 2023, the day that the Company unveiled Project Focus during the "FMC Investor Day 2023." During its presentation, FMC outlined its path forward from the "***destocking reset***" and the "***actions we're taking that significantly improve cost efficiencies across the enterprise and drive profitable growth***." FMC also detailed its efforts to ensure that "***the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024***." The Company told investors that it expected "***$50 million to $75 million of adjusted EBITDA contribution in 2024 from restructuring actions with approximately $150 million of run-rate savings by the end of 2025***."

26.     During the question-and-answer portion of the presentation, Defendant Douglas was asked about the normalization of channel inventory:

> Q: Michael J. Harrison, Seaport Research Partners: Mark, you talked a little bit earlier about your view that channel inventory levels might be below normal now at least in some regions. What gives you that visibility? Are you doing anything differently now than you have earlier in the year? And if so, what gives you that confidence?

A: Defendant Douglas: Yeah. Certainly when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. . . . I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen. There are some places where it won't be below normal. But I do think in the US, we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high. So that material will flow through the channel. It's already starting to flow through the channel. **So we expect that to normalize pretty quickly**.

27.    On December 18, 2023, FMC filed a Form 8-K describing the goals of its Project Focus cost restructuring and inventory balancing plan:

In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, which has materially impacted volumes in 2023, the Company has initiated a global restructuring plan, which we refer to as "Project Focus." ***This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity. The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented***.

28.    On February 5, 2024, FMC issued a press release announcing its results for the fourth quarter and full year ended December 31, 2023.  In the press release, FMC touted its "***strong results despite continued destocking***," and Defendant Douglas was quoted as stating that "***During the fourth quarter we observed continued channel destocking in all regions***."  The press release further stated that "First quarter revenue is expected to be in the range of $925 million to $1.075 billion, a 26 percent decrease at the midpoint compared to first quarter 2023 ***due to lower volume from destocking activity in all regions***."

29.    The next day, the Company hosted an earnings call for the fourth quarter of 2023 (the "Q4 2023 Call").  During the question-and-answer portion of the Q4 2023 Call, Defendant Douglas was asked about the rebalancing of inventory:

Q: Kevin William McCarthy: Okay. Thank you for that. And then secondly, perhaps for Andrew, can you talk about the amount of working capital that you think you can extract in 2024, including inventory. And as you draw down inventory, what impact do you think or do you expect that will have on your earnings, if any, I imagine it creates fixed cost absorption challenge. Is that true? And how would your guide be different if you weren't drawing down inventory, if that makes sense?

A: Defendant Sandifer: Yes. Thanks, Kevin. Sure. I think certainly, as we're looking to free cash flow for 2024. Working capital, particularly accounts payable and to a lesser degree, inventory are really the big drivers of cash release in 2024. *And that's in part because of an expectation as we go through the year, then we start rebalancing and production and inventory*. We have been intentionally throttling back pretty severely manufacturing over the past two quarters and well into Q1. We would expect to see some ramping back up in manufacturing activity as we go through Q2 through Q4. That will help with bringing up accounts payable.

30.     On February 27, 2024, the Company filed with the SEC a Form 10-K reporting the

Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-

K").  In the 2023 10-K, the Company described the following "General Risk Factor":

Channel inventory behavior – The Company relies in many countries and in varying degrees on distribution channels to access the market and reach farmers or other end use customers. *An abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations*. Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

31.     Appended as an exhibit to the 2023 10-K were signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") in which Defendant Douglas and Defendant Sandifer

certified that "[t]he [2023 10-K] fully complies with the requirements of Section 13(a) of the

Securities Exchange Act of 1934" and that "[t]he information contained in the [2023 10-K] fairly

presents, in all material respects, the financial condition and results of operations of the Company."

32.     On May 6, 2024, FMC issued a press release announcing its results for the first quarter ended March 31, 2024.  Defendant Douglas was quoted in the press release stating that "***Our second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023***."

33.     On the same day, the Company hosted an earnings call for the first quarter of 2024 (the "Q1 2024 Call").  During the Q1 2024 Call, Defendant Douglas stated that:

> ***Data from third parties as well as input from our commercial teams, shows that the inventory reduction actions in the channel are making good progress.*** On a regional basis, the pace of destocking is varied. We see North America furthest along with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory.
>
> EMEA is in a similar condition, except in countries hit by unfavorable weather. ***In both these geographies, our customers are now targeting to operate with inventories at lower than normal levels.*** In Latin America, inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year. We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1.
>
> ***While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns***. In North America, we continue to receive orders for products that will be used early in the current season, which indicates that the inventories of such products have now been depleted. In Brazil, customers are now discussing next season's volumes, providing visibility that we did not have last year. ***Our full year outlook assumes that the market improves as the year progresses, but the customers will seek to hold lower levels of inventory***.
>
> We are forecasting our second quarter results to be similar to the prior year. Sales are expected to be between $1 billion and $1.15 billion, which represents a year-on-year growth of 6% at the midpoint, driven by higher volume. ***This is the first quarter during which we expect to report an improvement in year-over-year volume since the start of global destocking***. Price is anticipated to be a headwind in the low- to mid-single digits and the FX outlook is neutral.
>
> […]

*EBITDA in the second quarter is expected to be between $170 million and $210 million, up 1% versus the prior year at the midpoint*. At the EBITDA midpoint, we expect that volume growth and restructuring benefits will be offset by lower price and COGS headwinds. Adjusted earnings per share is expected to be between $0.43 and $0.72, an increase of 15% at the midpoint, due mainly to lower interest expense and D&A.

34.    During the question-and-answer portion of the Q1 2024 Call, Defendant Douglas

was asked about the normalization of channel inventory:

> Q: Edlain Rodriguez, Mizuho Securities: As inventory destocking comes to an end and as you get into 2025, like, how do you see volume grow for the portfolio in 2025 and 2026?
>
> A: Defendant Douglas: Yeah. Listen, as we go through 2025, I think we've said that we expect what we would consider a more normal type of growth for the marketplace. Acres continue to grow, certainly, in Latin America and Brazil, so we expect that to be a driver. And don't forget, ***at that point, people will be then resetting from a lower level of inventory. So, you would expect more of a normal market growth***. Typical market like this grows at anywhere from 2% to 3% per annum, and we generally speaking with our differentiated portfolio, outgrow the market in the long haul.
>
> So, I think it's more about a normalized market. Demand on the ground, as we said, even in these conditions, is very good, we expect that to continue. As pressure continues to change, so we see that market piece as being pretty robust. Obviously, our NPIs are growing rapidly, so we would expect 2025 and 2026 to be actually faster than the growth we see in 2024.
>
> And then, the other piece of which is not really market driven, but just a view of 2025, we have a lot of cost headwinds flowing against us right now that are obviously depressing our EBITDA and our EBITDA margin. ***Those turn into tailwinds as we go into next year and I think it's an important facet as we walk through the next couple of earnings calls, as we build out the picture of what 2025 is going to look like, you certainly have got a more stable, more robust external market***. But we also have some pretty significant tailwinds in the sense of how we think about our P&L.

35.    On May 7, 2024, the next day, the Company filed with the SEC a Form 10-Q

reporting the Company's financial results for the first quarter of 2024 (the "Q1 2024 10-Q").  In

the Q1 2024 10-Q, the Company stated that:

> We expect 2024 free cash flow (Non-GAAP) to fall within a range of approximately $400 million to $600 million. At the mid-point of the range,

> ***there is a significant increase year over year driven largely by the rebuilding of payables and lower inventory***. . . . In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, we initiated the Project Focus global restructuring plan. ***This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***.

36.     Appended as an exhibit to the Q1 2024 10-Q were signed SOX certifications in which Defendant Douglas and Defendant Sandifer certified that "[t]he [Q1 2024 10-Q] fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

37.     On May 15, 2024, the Company participated in the BMO Global Farm to Market Conference.  In opening remarks, Defendant Douglas made the following statements about FMC's channel inventory levels:

> I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind. Certainly is on Andrew and I's – with my mind, I think ***as we go through the rest of this year and as we certainly go into 2025, you're going to start to see a more normalization***. It's not going to be smooth. It's going to be bumpy. ***But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish***. That's the phase we're in now. We call it a transition this year. I think that's an apt description.

38.     During the question-and-answer portion of the conference, Defendant Douglas was asked about channel inventory levels:

> Q: Joel Jackson, BMO Capital Markets: Why don't we talk about more regional, so we're talking more broad and maybe you can break down each region and talk about where the – how we're flipping from destocking to restocking? And how you see inventories in each region right now.

> A: Defendant Douglas: Yeah, I think I think there's been a lot of commentary around the different regions of the world. North America is probably the furthest along, was one of the first regions to get hit by this

change. I would say, distribution still a little high, retail and grower is very low. So ***North America is in pretty good shape. Europe's the next that is going through their season now. So they started to deplete last year. Depleting a lot more now.*** Asia is a mixed bag. India inventories are very high, that – we have high inventory, others in the industry have high inventory. That's mainly due to weather, though not necessarily the same dynamics as we see in the rest of the world. And then Latin America I mean, Latin America is finishing its season now. It's not bad. It's not exactly where it should be, but it's getting there. ***So as we roll into the 2024-2025 season in Q4 this year, it'll be in much better shape***.

39.     On June 11, 2024, the Company participated in the BMO Global Farm to Market Conference.  In opening remarks, Defendant Sandifer made the following statements about FMC's channel inventory levels:

> ***We're actually sitting in places where inventories are well below what has been historically held in the channel***. And we have a few places where we're a little slow to meet an order occasionally because we don't always have every single product on the shelf someone might want. There's a reason these products are carried in inventory during a growing season.
>
> The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five weeks from now, you need it today. ***So we are seeing these things rebalance. The timing and the magnitude of that rebalancing $324 million is a bit, it is a complicated issue we're working through. But I think fundamentals here, the in market demand is still strong as the channel inventory corrects. And we get more in sync the flow from manufacturers through the distribution channel into the grower hands, we will see a rebalancing and a rebasing of the business***.
>
> And that's where we see a pivot back to FMC of all in terms of our ability to drive growth with technology, with differentiation and with a closeness to customers and there's certainly places we can put down here on all those topics.

40.     During the question-and-answer portion of the conference, Defendant Sandifer was asked about channel inventory levels:

> Q: Richard Garchitorena, Wells Fargo Capital Markets: So as we enter 2025, the expectation is that inventories at that point should be at a place where?

A: Defendant Sandifer: Yeah, I think as we move into 2025, look I'm very careful about using the word normal because we've been through a period in the last five years. And I think anybody who tries to define normal at this point to fool's game. ***What we are seeing is improving conditions. We are seeing channel inventories reduce, we will see a rebalancing, a resining of pull through by growers from all the way back up channel back to manufacturers where that's been broken in the past four quarters as that channel, the inventory that built up in between needed to be drawn down***.

41.    On June 11, 2024, that same day, FMC announced that its Board of Directors had appointed Defendant Brondeau to succeed Defendant Douglas as Chief Executive Officer.  The leadership change at FMC was driven by the need for a stronger reset and more aggressive actions to address market challenges and reposition the Company for future growth.

42.    On July 30, 2024, FMC issued a press release announcing its results for the second quarter ended June 30, 2024.  In the press release, Defendant Brondeau was quoted as stating that "Demand improved during the second quarter, resulting in a pronounced increase in our sales volumes, most notably within the United States and Brazil, ***despite customers continuing to actively manage inventory***."  Defendant Brondeau further stated that "***We expect demand to increase as the year progresses even as customers maintain a careful approach of managing inventory***."

43.    On August 1, 2024, the next day, the Company filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the second quarter of 2024 (the "Q2 2024 10-Q").  In the Q2 2024 10-Q, the Company stated that it had been implementing the Project Focus restructuring plan "***to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***" and that "***We expect the plan to be fully executed by the end of 2025***."

44.    Appended as an exhibit to the Q2 2024 10-Q were signed SOX certifications in which Defendant Brondeau and Defendant Sandifer certified that "[t]he [Q2 2024 10-Q] fully

complies with the requirements of section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

45.     The same day, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Call").  During the Q2 2024 Call, Defendant Brondeau stated that "We expect continued growth in Q3 and Q4 from demand recovery led by the Americas, where we expect channel inventory to approach normal levels by year-end."  Defendant Brondeau further stated that:

> We delivered a solid Q2, helped by a successful execution of our restructuring program. **We expect continued growth in Q3 and Q4 from demand recovery led by the Americas, where we expect channel inventory to approach normal levels by year-end.**
>
> Q2 through Q4 also show higher revenue driven by volume with the rate of growth accelerating in Q4 as we shift into the next crop season. **The markets have begun to recover as channel inventories are starting to normalize, even if not as fast as we had previously expected.**

46.     On October 29, 2024, FMC issued a press release announcing its results for the third fiscal quarter ended September 30, 2024.  In the press release, FMC stated that "Revenue growth in the quarter of 9 percent was driven by a 17 percent increase in volume, with some North America second half orders occurring earlier than expected **due to improved channel inventory levels.**"

47.     On October 30, 2024, the next day, the Company filed with the SEC a Form 10-Q reporting the Company's financial and operational results for the third quarter of 2024 (the "Q3 2024 10-Q").  In the Q3 2024 10-Q, the Company stated that it had been implementing the Project Focus restructuring plan "**to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity**" and that "W**e expect the plan to be fully executed by the end of 2025.**"

15

48.     Appended as an exhibit to the Q3 2024 10-Q were signed SOX certifications in which Defendant Brondeau and Defendant Sandifer certified that "[t]he [Q3 2024 10-Q] fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [Q3 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

49.     The same day, the Company hosted an earnings call for the third quarter of 2023 (the "Q3 2023 Call").  During the Q3 2023 Call, Defendant Brondeau stated that:

> Looking ahead, *a view on the timeline of channel inventory recoveries is relatively unchanged from what we communicated during our August earnings call*. The US and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025. Asia markets are still expected to be challenging in 2025, with no recovery expected until 2026 as India continues to work through excess channel inventory.

> *On a cost basis, we are accelerating the delivery of savings and increasing our targets*. We are now targeting cost benefits from restructuring of $125 million to $150 million to be reflected in the P&L in 2024, with greater than $225 million of gross run rate in 2025. To accomplish this, we are accelerating restructuring, taking new critical initiative to realign our manufacturing footprint and using attrition as a key tool to drive further savings.

50.     On December 4, 2024, the Company participated in the Goldman Sachs Industrials and Materials Conference.  During the question-and-answer portion of the conference, Defendant Brondeau was asked about channel inventory:

> Q: Unidentified speaker: When you look at kind of the high watermark for that inventory and where you think you're at today with your products through the chain, how would you categorize the delta? Are you where you want to be all the way through the chain, or do you think there's still some more inventory to come out?

> A: Defendant Brondeau: I think it's very region dependent. *We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the*

16

*delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter*.

51.    The statements in ¶¶ 25-50 were materially false and misleading when made because they failed to disclose the following adverse facts: (a) that Project Focus was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (b) that FMC's channel inventories were not rebalancing or normalizing, and in fact were getting worse; (c) that Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (d) FMC's cost-plus pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (e) that FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (f) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

**The Truth Is Revealed**

52.    Investors learned about this fraud on February 4, 2025, when FMC reported its financial results for the fourth quarter of 2024, missing consensus revenue estimates by $90 million and revealing that "growth was below [the Company's] expectations as [it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically." FMC also provided a shockingly poor 2025 outlook, disclosing that it expects revenue to remain essentially flat due to "weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory." In an earnings call held the same day, the Company disclosed that it "need[s] to significantly lower FMC inventory in the channel much beyond what we were expecting."

53.    FMC further revealed that cost-plus pricing arrangements with certain important diamide wholesale partners, which were appealing to wholesalers because product pricing is indexed to manufacturing costs only, would cause a $130 million EBITDA headwind for 2025.

54.    Analysts reacted to this news with shock.  For example, analysts at KeyBanc Capital Markets cut price targets on FMC stock from $69 to $55, noting that "While normally a one-quarter inventory adjustment would not be such a shocking development, we are quite surprised to see a fresh inventory correction amid what should have been a recovery year." Analysts at Wells Fargo described it as a "shock to the system," and analysts at Morgan Stanley expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries." Analysts at UBS downgraded its rating on FMC stock from "Buy" to "Neutral" and cut its price target from $66 to $38 noting "The abrupt change to lower [manufacturing] costs and lower pricing to channel partners, is a bit of a surprise to us." Analysts at Bank of America downgraded its rating on FMC stock from "Neutral" to "Underperform" and cut its price target from $61 to $48, further stating that "the discussion of 'cost-plus' pricing is new, and in our view may be a newer pricing approach that passes some of the already-expected 2025 [cost of goods sold] tailwinds to FMC's diamide partners thus hitting margins."

55.    On this news, FMC's stock price fell $18.12 per share, or 33.5 percent, to close at $35.92 per share on February 5, 2025.

56.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

57.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public

documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

58.    The Individual Defendants permitted FMC to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

59.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FMC, their control over, receipt, or modification of FMC's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning FMC, participated in the fraudulent scheme alleged herein.

60.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of FMC common stock by disseminating materially false and misleading statements or concealing material adverse facts.  The scheme deceived the investing public regarding FMC's business, operations, and management and the intrinsic value of FMC stock and caused Plaintiffs and members of the Class to purchase FMC stock at artificially inflated prices.

**LOSS CAUSATION/ECONOMIC LOSS**

61.    During the Class Period, as detailed herein, FMC and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of FMC stock and operated as a fraud or deceit on Class Period purchasers of FMC stock by misrepresenting the Company's business and prospects.

Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of FMC stock declined as the prior artificial inflation came out of the price over time. As a result of their purchases of FMC stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

### A.    Applicability of Presumption of Reliance: Fraud on the Market

62.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased FMC common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

63.    At all relevant times, the markets for FMC stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, FMC filed periodic public reports with the SEC;

(b)    FMC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    FMC was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    FMC common stock was actively traded in an efficient market, the New York Stock Exchange, under the ticker symbol "FMC."

64.    As a result of the foregoing, the market for FMC stock promptly digested current information regarding FMC from publicly available sources and reflected such information in FMC's stock prices. Under these circumstances, all purchasers of FMC common stock during the Class Period suffered similar injury through their purchase of FMC common stock at artificially inflated prices and the presumption of reliance applies.

65.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**B.    No Safe Harbor**

66.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of FMC who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired FMC common stock during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder is impracticable.  FMC common stock is actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

69.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FMC;

(c)     whether the Individual Defendants caused FMC to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of FMC common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against FMC and the Individual Defendants

73.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FMC stock during the Class Period.

76.     Plaintiffs and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FMC stock.  Plaintiffs and Class

members would not have purchased FMC stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

77.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of FMC stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

78.    Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-77 as if fully set forth herein.

79.    The Individual Defendants acted as controlling persons of FMC within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control the actions of FMC and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

(A)    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(B)    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D)     Granting such other, further, and/or different relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: February 14, 2025

**BARRACK, RODOS & BACINE**

*/s/ Danielle M. Weiss*
Jeffrey A. Barrack
Danielle M. Weiss
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jbarrack@barrack.com
dweiss@barrack.com

*Liaison Counsel*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville
Guillaume Buell
Connor Boehme
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
gbuell@labaton.com
cboehme@labaton.com

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Thomas C. Michaud
Aaron L. Castle
79 Alfred Street

Detroit, Michigan 48201
Tel: (313) 578-1200
Fax: (313) 578-1201
tmichaud@vmtlaw.com
acastle@vmtlaw.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATION

I, Bryan Santo, as Vice-Chairman of Macomb County Employees' Retirement System ("Macomb County ERS"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Macomb County ERS.  I have reviewed a complaint prepared against FMC Corporation ("FMC") alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      Macomb County ERS did not purchase common stock of FMC at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Macomb County ERS is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Macomb County ERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Macomb County ERS' transactions in FMC common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Macomb County ERS sought to serve or currently serves as a lead plaintiff or representative party in the following class actions under the federal securities laws filed during the last three years:

> *Collinsville Police Pension Board on Behalf of the Collinsville Police Pension Fund v.*
> *Discovery, Inc.*, No. 1:22-cv-8171 (S.D.N.Y.)
> *Schaeffer v. Signature Bank*, No. 1:23-cv-1921 (E.D.N.Y.)
> *Kangas v. Illumina, Inc.*, No. 3:23-cv-2082 (S.D. Cal.)
> *McAlice v. The Estee Lauder Companies Inc.*, No. 1:23-cv-10669 (S.D.N.Y.)
> *Cleveland Bakers and Teamsters Pension Fund v. Lamb Weston Holdings, Inc.*,
> No. 1:24-cv-0282 (D. Idaho)
> *Patel v. Lululemon Athletica Inc.*, No. 1:24-cv-6033 (S.D.N.Y.)

6.      Beyond its pro rata share of any recovery, Macomb County ERS will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 14th day of February, 2025.

Bryan E. Santo

_Bryan Santo_
Vice-Chairman
Macomb County Employees' Retirement System

2

**EXHIBIT A**

**TRANSACTIONS IN FMC CORPORATION COMMON STOCK**

| Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 06/07/24 | 6,860 | $57.20 | ($392,424) |
| Sales | 08/12/24 | (1,000) | $60.53 | $60,534 |
| Purchases | 11/14/24 | 4,245 | $55.49 | ($235,536) |
| Purchases | 12/17/24 | 3,085 | $51.47 | ($158,799) |

## CERTIFICATION

I, Harold Haugh, as Chairman of Macomb County Retiree Health Care Fund ("Macomb County RHC"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Macomb County RHC.  I have reviewed a complaint prepared against FMC Corporation ("FMC") alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      Macomb County RHC did not purchase common stock of FMC at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Macomb County RHC is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Macomb County RHC fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Macomb County RHC's transactions in FMC common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Macomb County RHC sought to serve or currently serves as a lead plaintiff or representative party in the following class actions under the federal securities laws filed during the last three years:

> *Schaeffer v. Signature Bank,* No. 1:23-cv-1921 (E.D.N.Y.)
> *Kangas v. Illumina, Inc.,* No. 3:23-cv-2082 (S.D. Cal.)
> *McAlice v. The Estee Lauder Companies Inc.,* No. 1:23-cv-10669 (S.D.N.Y.)
> *Cleveland Bakers and Teamsters Pension Fund v. Lamb Weston Holdings, Inc.,*
> No. 1:24-cv-0282 (D. Idaho)
> *Patel v. Lululemon Athletica Inc.,* No. 1:24-cv-6033 (S.D.N.Y.)
> *Macomb County Retiree Health Care Fund v. PDD Holdings Inc.,*
> No. 1:24-cv-6881 (S.D.N.Y.)

6.      Beyond its pro rata share of any recovery, Macomb County RHC will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this   1 4   day of February, 2025.

*Harold Haugh*
Chairman
Macomb County Retiree Health Care Fund

**EXHIBIT A**

**TRANSACTIONS IN FMC CORPORATION COMMON STOCK**

| Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 06/07/24 | 3,215 | $57.20 | ($183,913) |
| Purchases | 11/14/24 | 2,090 | $55.49 | ($115,965) |
| Purchases | 12/17/24 | 1,405 | $51.47 | ($72,322) |